The administration of this estate has heretofore been given consideration by this court on an appeal from an order settling an account of the executors. (In re Connolly's Estate, 73 Mont. 35,235 P. 408.) The order of the district court was reversed and the proceeding remanded "with directions to require F.A. Flanagan and the representative of Catherine Connolly, *Page 448 
executrix," deceased widow of the testator, to file "full and complete accounts and reports of their administration of the estate" of the testator, and for the court "to proceed to a hearing thereon in conformity with the law and the views expressed by this court in its decision." Pursuant to the order so made by this court, on July 30, 1925, Mary Connolly, administratrix of the estate with the will annexed, filed a separate report and account, and subsequently, on December 26, 1925, F.A. Flanagan, a former executor of the last will and testament of Martin Connolly, deceased, made and filed his separate final report and statement of account in the matter of the administration of the estate.
The presiding judge of the twelfth judicial district, having been disqualified in the proceedings, made an order reading, in part, as follows: "In this matter, under requirement and direction of the Supreme Court, F.A. Flanagan, former executor of said estate, and Mary Connolly, administratrix with the will annexed of said estate, having filed the required reports, and H.F. Miller having filed petition for allowance of attorney's fees, and affidavits disqualifying the presiding judge of this court having been filed, and the said judge being unable to obtain the attendance of outside judges, and motion having been filed to transfer the same to the eighth judicial district of the state of Montana, in and for the county of Cascade; Now, therefore, it is hereby ordered that all questions concerning the accounts of the executor and executrices be, and the same are hereby, transferred to said eighth judicial district, together with all questions concerning said accounts and said question of the allowance of attorney's fees, said disqualification of the presiding judge having been been directed solely against the hearing of said accounts and the question of said attorney's fees. And the clerk of court is hereby directed to forward to the clerk of the court of the said eighth judicial district all documents in connection with said accounts and the question of said attorney's fees, and such other files as counsel on either *Page 449 
side of the matter may request." No question is raised as to the propriety of such order.
On January 2, 1926, Ailleen Connolly Swanson, Mary Connolly and Mary Connolly, administratrix with the will annexed of Martin Connolly, deceased, being all the beneficiaries under the will of the decedent, duly made and filed their exceptions to the amended, separate, and final account of F.A. Flanagan. The matter duly and regularly came on for hearing at Great Falls, in Cascade county, before Honorable H.H. Ewing, District Judge, sitting without a jury, on the twenty-fifth day of May, 1926, and at the conclusion of the evidence submitted by all of the parties, the court, on the fifteenth day of November, 1926, duly and regularly made and entered its order settling the account of F.A. Flanagan as such former executor. The contestants of Flanagan's separate and final account have appealed to this court from so much of the decree of settlement thereof as fails to charge him as an individual debtor of the estate, to have been able to pay his entire personal indebtedness to the estate during the time he acted as executor, "and which fails to find, adjudge, and decree that he is liable, as such executor, for said entire individual indebtedness," as for so much money in his hands, "and which fails to charge his said account with the whole thereof accordingly"; also from that part of the decree "which approves the payment of $1,000, attorney's fee, reported in said account, and which adjudges and decrees that $750 additional attorney's fee be paid by said estate to H.F. Miller, as such attorney."
Flanagan has appealed from the judgment in so far as it purports to hold him liable for certain moneys belonging to the estate, specifically set forth in the order of the court. On this appeal briefs have been filed and arguments made on behalf of F.A. Flanagan, appellant, on the part of the contestants, and by H.F. Miller as a party interested in the allowance of attorney's fees. The several assignments of error specified by these separate appellants present for decision on this appeal question as to the extent of the responsibility of an *Page 450 
executor for the loss of assets belonging to an estate in course of administration, and with what expenses incurred in the course of administration he will be charged.
The district court, by its order, allowed and settled the accounts of Frank A. Flanagan, former executor, with the exception of certain specific items identified as follows:
(1) On certificate of deposit and open account in Benton State Bank ............................. $ 7,075 59 (2) On O'Hanlon Land Live Stock Company note 5,748 82 (3) Balance on $11,900.00 joint note of Flanagan and Sullivan .................................. 10,720 98 (4) On penalty to revenue collector ................ 20 00
After allowing certain credits on these several items, the court found the balances due from the former executor on each as shown above, totaling the sum of $23,565.39. The court also awarded the former executor an attorney's fee of $750 in addition to a fee of $1,000 theretofore allowed.
We find discrepancies in the court's computation as made in[1, 2] its order, and also material differences between our figures in applying the order and those made by counsel for the executor. We see no course open to us, other than to decide this case independently, on the cold record before us, upon the questions presented, with due consideration to the findings of the district court in each instance. Any other method of procedure would entail further unnecessary delay in the administration of the estate, and great expense. Moreover, this is the second time the executor's accounts have been before us in this estate, and the estate has been in process of administration for ten years. The administration of estates is peculiarly within the cognizance of equity, and the court, in adjusting the accounts of executors and administrators, is governed by the principles of equity, as well as of law. The court is not fettered by any rule of law from doing exact justice as between all parties in interest. (In re Niles, 113 N.Y. 547,21 N.E. 687.) And in proceedings of an equitable nature, this court will, in proper cases, review all questions of fact arising *Page 451 
from the evidence presented by the record, and determine the same, as well as questions of law. (Sec. 8805, Rev. Codes 1921.)
An understanding of the facts is required for an intelligent determination. Martin Connolly, a resident of Chouteau county, died some time in the spring of the year 1917, since it appears that his will was executed on March 22, 1917, and letters testamentary were by the district court issued jointly to Catherine L. Connolly and Frank A. Flanagan on June 1, 1917. Thereafter the executors named entered upon the discharge of their trust and jointly continued the administration of the estate until the twenty-second day of September, 1923, when Flanagan's resignation was regularly accepted and his letters testamentary revoked. Up to about that time Catherine L. Connolly, who was the widow of the deceased, left to her associate executor the management and conduct of all of the business of the estate, reposing implicit confidence in him. Disagreement between them resulted in Flanagan's resignation as executor and the acceptance thereof. It was after the decision on appeal to this court from the order settling the executors' joint accounts that the separate account of Flanagan herein involved was made and filed.
It appears that Flanagan owed to the decedent before his death considerable money represented by promissory notes. He was personally indebted on one promissory note to Connolly in the sum of $5,000, with interest, which note was secured by collateral, and another unsecured note for the principal sum of $8,000. He was also obligated to Connolly jointly with one Sullivan on a note for the principal sum of $11,900. All of these notes and securities with other property came into Flanagan's possession after the death of Martin Connolly, and the issuance of letters testamentary. The $5,000 note with accrued interest was paid in full during Flanagan's tenure of office as one of the executors of the will of the decedent. One hundred and sixty-seven shares in the O'Hanlon Land Live Stock Company were pledged as security for the payment *Page 452 
of the $11,900 indebtedness, of which eighty-four shares belonged to Flanagan and eighty-three to Sullivan. The court found that during the time Flanagan was executor this stock had value, and that it was his duty to foreclose the pledge and apply the proceeds on this indebtedness, and that, had he made timely foreclosure as was his duty, he could have received a sufficient amount of money to have paid this indebtedness in full. Accordingly the executor was held liable for the unpaid balance of that note amounting to $10,720.98. As noted above, the court's specific finding as to Flanagan's responsibility related only to his joint indebtedness with Sullivan on the note for $11,900. As to his indebtedness to the estate represented by his individual notes to the decedent, the court's findings absolved him from responsibility for failure to pay the same. With regard thereto it was by the court found that "while he did not pay to the estate all he could of his indebtedness, while he was executor, yet the evidence fails to show that he acted in bad faith."
Respecting the funds of the estate on deposit with the Benton State Bank, it appears that Flanagan was, during the time he acted as such executor, the cashier of that bank up until it closed because of insolvency, and was acquainted with its financial condition; that the decedent in his lifetime dealt with the bank and was one of its stockholders; that the bank held and owned the note of the O'Hanlon Land Live Stock Company for the principal sum of $10,333.33, interest bearing at the rate of ten per cent, secured by a mortgage on certain livestock, which note Flanagan purchased from the bank as an investment for the estate funds without obtaining authority therefor from the court. The separate report of Flanagan recites that during the administration of the estate the executors made five loans of money on real estate and personal security, without the consentor authorization of the court having jurisdiction of the estate, amounting in the aggregate to $17,233.33, among which loans is listed the O'Hanlon Live Stock Company's *Page 453 
indebtedness, purchased by Flanagan as stated above. The balance due on this investment of estate funds, amounting to the sum of $5,748.82, was, as above indicated, charged by the court against Flanagan as executor. The item of $20 "on penalty to revenue collector," charged to the executor, represents a penalty assessed by the United States internal revenue collector because of the failure of Connolly's executors to prepare and file an inheritance tax report on time in compliance with the laws of the United States.
1. As to the funds of the estate on deposit with the Benton[3] State Bank, the executor was held liable for the aggregate sum of $7,075.59. In arriving at such amount the court found that on March 20, 1918, the sum of $4,043.75 had been put into a certificate of deposit, and computation of the amount due with reasons for holding the executor responsible appears in the order as follows: "The loan to the Benton State Bank, in the form of certificate of deposit, was unauthorized by the court, and the executor is hereby held liable for such funds, amounting at the time the bank closed, December 26, 1922, including interest, to $5,936.03. At the time the Benton State Bank failed, and for several years prior thereto, Frank A. Flanagan was cashier of the bank, and knew, or should have known, the bank was not a safe place to keep the estate's money, and for that reason the court holds that the former executor is liable for the
Money owned by the estate on deposit in open account in the bank, to-wit, $30.03, which, added to the certificate of deposit, including interest on the same to the time the bank closed, amounts to ........ $5,966 06 Interest on this amount from the time the bank closed, December 26, 1922, at 8 per cent per annum to date of this decree amounts to ................... 1,856 05 _________ $7,822 11 *Page 454 
Less dividend received on bank certificate September 23, 1923 ........................................... 596 60 _________ $7,225 51 Less interest on dividend from September 23, 1923, to date of this decree ....................... 149 92 _________ Being the total amount of ............................. $7,075 59 — that the executor owes the estate on account of money in the Benton State Bank at the time it closed."
The inventory and appraisement of the estate shows the following among other assets: "Time deposits Benton State Bank $9,526.40." The report and evidence received in support thereof shows without dispute, that at the request of his coexecutrix, Flanagan had, during the year 1922, made transfer of $15,800 belonging to the estate from the Benton State Bank to the First National Bank of Great Falls, which money had been carried on open account, leaving a balance on open account in the Benton State Bank of $30.03, and that, in addition to such balance, he carried on time deposit with the Benton State Bank the sum of $5,408, represented by the latter bank's certificate of deposit bearing interest at the rate of four per cent per annum at the time of the failure of that bank, on December 23, 1922. The valuable papers belonging to the estate were all kept in a lock box in the Benton State Bank, prior to the time of disagreement between Mrs. Connolly and Mr. Flanagan, to which box Mrs. Connolly and Mr. Flanagan held separate keys, and had access. After the trouble between them, somewhere about September, 1922, Mrs. Connolly removed all such papers from the safety deposit box without the knowledge or consent of Mr. Flanagan, and he did not discover that they had been removed until about a month later. Subsequent to the removal of the estate papers from the lock box by Mrs. Connolly, her daughter, Ailleen, asked Mr. Flanagan to transfer to another bank the estate *Page 455 
moneys remaining on deposit with the Benton State Bank. Flanagan testified:
"Q. What, if any, conversation did you have with Ailleen regarding the withdrawal of the $5,408 which was on the certificate of deposit? A. She had come into the bank the first time and asked me to transfer this money, and I had made some of these transfers, but she came in later on, and I told her, I said, `I have transferred the money on account, all but a small balance'; and I said, `You have the certificate of deposit'; and I said, `Before I can transfer that, it will have to be returned and indorsed by your mother.' It was in the safety box in the vault, and, without my knowledge, they came in and took all the papers out, and with it that certificate, and I have no control of the certificate, but I told her, if she would indorse it and bring it in, I would transfer that.
"The Court: Was it afterwards indorsed and given to you? A. No, sir.
"Q. Could you have made a transfer of that certificate without it being surrendered? A. No, sir.
"Q. What time did you have that conversation with Ailleen, if she would produce the certificate? A. I couldn't say definitely, but it was several weeks before the bank closed.
"Q. They never did bring it in? A. I have never seen it since.
"Q. Was anybody present when you had this conversation with Ailleen in regard to producing the certificate? A. Yes; my sister was the bookkeeper at the bank and was there at the time Ailleen came in.
"Q. What is her name? A. Mae Flanagan.
"Q. If she had brought that certificate down as requested at the time you requested her to do so, would the transfer have been made of that money also? A. It would have been.
"The Court: Who took the certificate from the bank? A. Why, I don't know; Miss Connolly, I guess. I had it in the lock box. I had one key and they had one key, and the papers were all kept in this lock box, and just when they were taken *Page 456 
out I don't know. It was along, I think, in September or October I noticed all the papers were gone.
"Q. The certificates and notes? A. Everything pertaining to the estate. The box was empty."
And Flanagan states positively that he did not know or realize that the Benton State Bank was insolvent or likely to close its doors to business on account thereof until about three days before it suspended business, and there is no evidence to the contrary. He testified:
"Q. The next item to which objection was made is a deposit of five thousand four hundred and eight dollars that was in the Benton State Bank when it closed. It is claimed by the objectors, the heirs of the will, that you were negligent in not withdrawing this deposit before the bank closed. I will ask you to state when you first knew that the bank was apt to close? A. I knew the bank was going to close on December 23, 1922.
"The Court: What day did the bank close? A. December 23. * * *
"Q. Now, at that time, did you know in approximate numbers what the loans and discounts of the bank were? A. Yes; I think six hundred and sixty some odd thousands of dollars.
"Q. What were the deposits in round numbers? A. Some three hundred thousand dollars.
"Q. So that your loans and discounts and assets were more than double the amount of deposits you had at that time? A. Yes, sir.
"The Court: What did the bank owe at that time? A. Two hundred ninety-five thousand dollars, I think, it was in borrowed money.
"Q. Two hundred and ninety-five thousand or one hundred and ninety-five thousand? A. One hundred and ninety-five thousand. Whatever that statement shows. One hundred and ninety-five, I guess, and capital one hundred and twenty-five, and surplus twenty-five. *Page 457 
"Q. Had you on the morning of the 22d and the morning of the 23d of December, 1922, been endeavoring to make arrangements for borrowing additional money to carry on the bank? A. Yes, sir; I was still trying.
"Q. It was not until you failed in making that transaction, the evening of the 22d and the morning of the 23d, that you first knew the bank had to be closed? A. Not until I ascertained definitely that I couldn't get any more money did I know we would have to close."
From the record it is apparent that this time deposit remaining unpaid when the Benton State Bank became insolvent was a continuation of like deposit made by the testator in his lifetime. The court was in error in basing its computation on the item of March 20, 1918, "put in certificate of deposit No. 3842, $4,043.75," and holding the executor responsible therefor with accrued interest, because of the unauthorized investment of estate moneys. From the account it clearly appears that this certificate was fully paid with interest on May 9, 1921. Whatever may be the correct basis of computation of the amount on deposit belonging to the estate, we do not agree with the court's conclusion respecting the liability of the executor.
The executor is chargeable with the whole of the estate of the decedent which may come into his possession, at the value of the appraisement contained in the inventory (sec. 10282, Rev. Codes 1921); and while he is prohibited from making profit from its increase, yet he is not required to "suffer loss by the decrease or destruction, without his fault, of any part of the estate" (Id. 10283).
The universal rule seems to be that "executors and administrators are not insurers, nor will they be chargeable with the loss or depreciation of the assets where they have acted in good faith and with due prudence and diligence in the care and management of the estate, but they are liable for losses which are the consequence of bad faith or the want of due prudence and diligence." (24 C.J., p. 123.) *Page 458 
An executor fulfills his trust obligation to the estate when he deposits estate funds temporarily with a responsible bank; and, where he acts in good faith in the exercise of his best judgment, he is not liable for loss occasioned by the failure of such bank. (Pethybridge v. First State Bank of Livingston,75 Mont. 173, 243 P. 569; State v. Kearns, ante, p. 299;257 P. 1002; Woerner on Administration, 2d ed., p. 710; 11 Cal. Jur., p. 1023.)
From the evidence we are of opinion that the executor was not guilty of such neglect of the estate funds in continuing the balance thereof, amounting to $30.03, on open account deposit with the Benton State Bank, as to render him liable upon the failure of that bank; nor for failing to transfer to another bank the amount on time deposit, since his coexecutrix held the certificate of deposit, and, although requested by him to surrender it for payment, failed to do so. Even though he was asked by his coexecutrix to transfer the money on time deposit to another bank, he should not be charged with her neglect to deliver the certificate of deposit for payment. From all the facts, the executor should be absolved from liability for such deposits of estate funds remaining with the Benton State Bank when it closed its doors.
2. The executor admits that he made purchase of the note of[4, 5] the O'Hanlon Land Live Stock Company from the Benton State Bank, as an investment of funds belonging to the estate without authority of court. For this reason he is by the order of the court charged with the balance remaining unpaid amounting to $5,748.82. In regard to this item the court's order reads as follows:
"The loan to the O'Hanlon Land Live Stock Company was unauthorized by the court, and was made upon the executor's own responsibility May 9, 1921 ......................................... $10,333 33 Eight per cent interest from May 9, 1921, to November 16, 1921 ................................... 430 55 __________ $10,763 88 *Page 459 
November 16, 1921, paid on said loan .................. 1,396 37 __________ Leaving a balance of .................................. $ 9,367 51 Interest on said balance from November 16, 1921, at 8 per cent per annum to April 18, 1923 ............................................... 1,065 81 __________ $10,433 32 Paid on loan April 18, 1923 ........................... 5,963 00 __________ Leaving a balance of .................................. $ 4,470 32 Interest on said balance from April 18, 1923, at 8 per cent per annum to date of this decree ......... 1,278 50 __________ Total due the estate on account of executor's loan to O'Hanlon Land Live Stock Company .......... $ 5,748 82"
It appears that this investment of estate funds was made by the executor on May 9, 1921; the Benton State Bank, original payee of the note, making indorsement and delivery thereof, together with collateral security. The note bears interest at the rate of ten per cent per annum, and was secured by a chattel mortgage on 195 head of cattle and 90 head of horses. In the annual report filed jointly by Mrs. Connolly and Frank Flanagan, as coexecutors, February 26, 1923, this loan is listed and interest payments made shown. Both asked the approval of this account, and Mrs. Connolly and her daughters were present when it came on for hearing and made no objection thereto. However, after the failure of the Benton State Bank, and before the court had acted on the account, Mrs. Connolly and her two daughters joined in a petition asking for the removal of Flanagan as executor because of such misuse of estate funds. The property covered by the chattel mortgage securing the indebtedness was sold on foreclosure at the request of Mrs. Connolly and her two daughters, being all the beneficiaries under the testator's *Page 460 
will, and the proceeds of such sale, amounting to $5,963.00, applied on the debt. It is worthy of note, however, that this foreclosure was conducted over the vigorous protest of Flanagan, as coexecutor, asserting that a sale at the time proposed would result in great loss because of the condition of the livestock and of the market.
Since the account made by the joint executors had not been passed upon, when Mrs. Connolly and her daughters filed objections thereto, the court properly considered them, although the practice is not approved. (In re Connolly's Estate,73 Mont. 35, 42, 235 P. 408.) In our opinion, consistent with the views by this court expressed on the former appeal, the trial court properly found the executor responsible for the balance remaining unpaid on the investment by him made of estate funds in the O'Hanlon Land Live Stock Company note. Upon this very question, it was by this court held, and, we think, correctly, that "an executor or administrator who, without having proceeded regularly, assumes to act upon matters which are required by the statute to be done only pursuant to orders of court, is in a position where, if any loss to the estate results, he will be held liable, regardless of his other efforts to protect the estate; whereas, if proceedings are regularly taken to secure the authorization of the court in advance of actual steps being taken, the extent of the liability is that the representative may show that the loss was not occasioned by his own fault. If this showing is made, he will not be held liable for such loss. However that may be, we are confronted in this matter with a situation which discloses that the estate funds had been invested without compliance with the statute. * * * Bearing in mind that the funds invested were estate funds, the entire amount which would be collected would belong to the estate, and this is so without regard to the question whether the investment was of a character which is permitted by section 10306, supra, or whether the steps had been taken as therein provided to secure the authority to invest. The amount or amounts with *Page 461 
which the executors would be properly and finally chargeable as a result of such transactions would be the difference between the amount collected and the amount invested." By its order the trial court properly interpreted and applied the rule so established, and its action in this respect is affirmed.
3. As to the personal indebtedness of the executor to the[6, 7] estate, represented by his individual promissory notes, payable to testator, the district court refused to hold the executor responsible in his representative capacity. The statute provides: "The naming of a person as executor does not thereby discharge him from any just claim which the testator has against him, but the claim must be included in the inventory, and the executor is liable for the same, as for such money in his hands, when the debt or demand becomes due." (Sec. 10133, Rev. Codes 1921.)
In construing this statute on the former appeal, this court held that the executor is not thereby made liable in his representative capacity upon his indebtedness to the decedent,"as for money in hand," where during the progress of administration he was without means or funds with which to pay the same. It was by this court said: "Both on precedent and on our own construction of the statutes of this state, we are of the opinion that the sound rule is that which holds that the executor, as well as the administrator, who was also a debtor to his decedent at the time of death, is not liable, where, after meeting the burden which is upon him to account for all assets, he shows that he has not been guilty of neglect toward any asset and is in a position to turn over all of the estate which he received when he assumed the trust, including such cash as he could with due diligence recover upon his own and all other debts due his decedent, together with such of his own and other indebtedness as he had not been able to recover for the estate during his administration. It is probably unnecessary to do so, but as a precaution it may be best to add that, where credit has been allowed for *Page 462 
any loss or authorized deduction, the representative is not liable to turn over any amounts for which he is entitled to credit." The district court, in applying such construction of the statute to the evidence, refused to hold the executor responsible in his representative capacity as for so much money in hand on account of his individual indebtedness to the estate represented by his promissory note to the decedent for the sum of $8,000 and accrued interest. There is conflict in the testimony, but the court was justified in concluding therefrom, as it did, that the executor should not be held responsible in his representative capacity for the balance of his individual indebtedness to the estate remaining unpaid; such obligation having been contracted during the testator's lifetime, and the executor having satisfactorily shown his inability to pay any greater portion of his personal indebtedness to the estate. An executor or administrator will not be held accountable for debts due the decedent, where they remain uncollected without his fault. (Sec. 10284, Rev. Codes 1921.) And the executor's personal indebtedness to the estate incurred to the testator in the latter's lifetime is properly placed in this category by our former decision.
4. Respecting the indebtedness of the executor to the estate[8] on a note executed by him jointly with Frank Sullivan to the testator, the court found consistently with the evidence before it, and the rule established by the decision on the former appeal, that —
 "On the ........................................ $11,900 00 note, interest was paid to January 3, 1920. "Interest on the $11,900.00 note from January 3, 1920, to January 15, 1920, at 8 per cent per annum, 12 days ........................................... 31 68 __________ $11,931 68 "On January 15, 1920, there was paid on the principal of said note the sum of .................. 5,000 00 __________ "Leaving a balance of ........................... $ 6,931 68 *Page 463 
Interest on the new principal $6,931.68, at 8 per cent per annum, from January 15, 1920, to date of this decree ................................... 3,789 30 __________ Being the balance .................................. $10,720 98 that the executor owes the estate on the joint note.
"The $11,900 note was secured by 167 shares of stock of the O'Hanlon Land Live Stock Company. Of this Flanagan owned 84 shares, and Sullivan, the joint maker of the note, owned 83. That during the time Frank A. Flanagan was executor, the evidence shows this stock had some value. It was his duty to foreclose the pledge and apply the money towards his indebtedness, and the court holds that he could have received for such shares of stock sufficient to have paid the balance of this $11,900 note in full."
It appears that Flanagan was at all the times involved herein the president and manager of the O'Hanlon Land Live Stock Company, cashier of the Benton State Bank, and subsequent to Connolly's death, one of the executors of the latter's will, manager of the business of the estate, and its principal debtor. And it must be borne in mind that, in addition to his joint obligation to the estate on this note, he was individually indebted thereto to the extent of $13,000. Notwithstanding such condition of affairs, he stood idly by, after the maturity of the debt, and permitted the collateral security to become valueless. This note was executed on January 3, 1914, and made payable one year after date with interest at the rate of eight per cent per annum. Flanagan and Sullivan borrowed this $11,900 from the testator with which to purchase stock in the O'Hanlon Land Live Stock Company, and therewith they made purchase of 167 shares of such stock and thereupon delivered it in pledge to the testator as security for the payment of the debt. Speaking of its value after the maturity of the debt, and after it had come into his possession as executor, Flanagan testified that in the year 1917, while it did not have a market value, "it was worth around par." *Page 464 
And W.R. Early, a witness for the executor, testified that in the years 1917 and 1918 the capital stock in the O'Hanlon Company was worth "about par." Its book value was $100 per share, and it must be remembered that, while this indebtedness remained unpaid, secured as it was by stock in the O'Hanlon Land Live Stock Company, on May 9, 1921, the executor expended estate funds to the amount of $10,333.33 in the purchase from the Benton State Bank of the note of the O'Hanlon Company, of which he was then the president. The executor must have considered the O'Hanlon Company solvent at that time, otherwise he would not have invested in its paper, and, if it was not then entirely responsible, he was guilty of the grossest misuse of estate funds. From 1917 to 1923 he held the note long past due, and the security, but made no effort to dispose of the security in liquidation of the amount due. His manifest neglect in the collection of this obligation due the estate, coupled with his personal interest in the O'Hanlon Company, amply justifies the court's findings on this item.
As stated in the former opinion of this court, the burden rested upon the executor, in order to escape liability, to show that his failure to collect the amount of the indebtedness was not the result of his own neglect. This is not sustained by the evidence as respects this obligation; in fact, the evidence clearly points to his gross mismanagement and neglect. It is plain that the loss was occasioned entirely by reason of his fiduciary relationship, and therefore he is properly held liable.
5. The executor was fined under the United States Internal[9] Revenue Law (U.S. Comp. Stats., sec. 5896b) the sum of $20 as a penalty for failure to file the required inheritance tax return within the time limit prescribed, and the court held him liable in his representative capacity for that amount. Neglect on the executor's part appears, and, in our opinion, the finding is correct, and should not be disturbed. The executor testified with regard thereto that he did not know whose fault it was; "Charge it to me if you want to." *Page 465 
6. The court allowed the executors the sum of $1,000 on[10] account of attorney's fees paid, and authorized the payment by the estate of an additional amount of $750 to Attorney H.F. Miller for services rendered in the matter of the estate to the joint executors. The contestants make complaint thereof, and assign the same as an error committed by the court. The sum of $1,000 attorney's fees was paid by the joint executors to the attorney on March 8, 1923, on account of six years of services rendered the estate and the executors, and was not in full of account. In his final report and account Flanagan, the former executor, states: "There is a further contingent liability of said estate in the sum of $1,500, balance due to Attorney H.F. Miller, as attorney's fees, for his services to said executors which he has petitioned the court to allow him, which petition is now on file in the records of said estate and which he claims is due, owing and unpaid."
The estate inventoried over $70,000 and the services rendered covered a period of more than six years, included in which were large collections of money due the estate and the sale of real property belonging to it. The total value of the estate with accretions is shown to have amounted to the sum of $93,590.16. In support of the reasonableness of the attorney's fees asked, Attorneys J.W. Speer and J.W. Freeman testified, the former that the services rendered were reasonably worth $5,000, and the latter estimated the reasonable value thereof at $3,000. This testimony stands uncontradicted, and, in view of all of the evidence before the court, we see no reason to interfere with the court's findings with respect thereto.
7. No complaint is made by any of the parties to the allowance to the executor of a commission of $1,000 for services rendered, the same to be deducted from his indebtedness to the estate; and, as it appears to us to be entirely warranted, it will be permitted to stand.
The court's finding to the effect that the executor could have[11] sold the forty-two shares of stock in the Benton *Page 466 
State Bank for the sum of $6,300 is not supported by the evidence. It appears that this bank stock was by the executor pledged with the testator in his lifetime as security for the payment of a note dated May 9, 1916, for the principal sum of $5,000, executed by the executor to the decedent. There is nothing in the record to indicate the date of the maturity of this obligation, and it appears to have been paid in full October 2, 1919. Upon its payment the security ipso facto reverted to the unrestricted ownership and possession of the executor in his personal capacity (Averill Mach. Co. v. Bain, 50 Mont. 512,148 P. 334) and no greater duty then devolved upon him to make sale of that particular piece of property than other of his assets. His obligation was to convert such of his assets as were salable into cash and apply the same upon his indebtedness to the estate. If there was no sale for this bank stock after its release from pledge, he could not get cash for it, no matter what the book value thereof may have previously been. "The provision of the section [10133] respecting the liability of an executor toward his own debt, `as for such money in his hands,' accomplishes no more than to provide that executors shall be held liable to the same extent administrators are for their personal indebtedness to their decedents, and that the `money in hand' rule is not a rule affecting the liability upon the debt, but is a rule governing the method of accounting for the debt, and establishing the extent of the liability of the representative. * * * If at any time during the course of the administration he is able to actually turn the debt, or any portion thereof, into cash, it is his duty as the representative to do so. * * * The sound rule is that which holds that the executor as well as the administrator, who was also a debtor to his decedent at the time of death, is not liable, where, after meeting the burden which is upon him to account for all assets, he shows that he has not been guilty of neglect toward any asset, and is in a position to turn over all of the estate which he received when he assumed the trust, including such cash as he could *Page 467 
with due diligence recover upon his own and all other debts due his decedent, together with such of his own and other indebtedness as he had not been able to recover for the estate during his administration." (In re Connolly's Estate, supra.)
The evidence is to the effect that, when Flanagan was appointed as executor of the Connolly estate, June 1, 1917, this bank stock was considered to have a value of about $150 per share. It was released from pledge October 2, 1919, upon the payment of the debt, and the testimony is that thereafter it had no sale value, for the reason that in the latter part of the years 1919 and 1920, throughout the country, there were many bank failures, and people did not wish to invest in bank stock. Mr. Flanagan testified that he did not know of any bank stock being sold at the time, and did not believe that his stock in the Benton State Bank could have been sold. This is the only evidence upon the subject and it is not sufficient under the rule established to hold the executor in his representative capacity for a failure to convert this particular asset into cash amounting to the sum of $6,300, or any other sum, and apply it on account of his indebtedness to the estate.
The cause is remanded to the district court of the eighth judicial district, with directions to modify the order to conform to the views expressed in this opinion. Costs of this appeal are assessed one-half against the executor and a like amount against the contestants.
Remanded for modification.
MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MYERS, STARK and MATTHEWS concur.
Rehearing denied July 7, 1927. *Page 468