IN RE MULLEN'S ESTATE. MULLEN ET AL., APPELLANTS,
*v.* DURRIE, ADMINISTRATOR, RESPONDENT.

(No. 7,215.)

(Submitted April 19, 1934. Decided May 26, 1934.)

[33 Pac. (2d) 270.]

*Mr. W. J. Paul* and *Mr. E. W. Keeley*, for Appellants, submitted a brief and argued the cause orally.

146

*Mr. Howard Toole*, for Respondent, submitted a brief and argued the cause orally.

148

MR. JUSTICE ANDERSON delivered the opinion of the court.

Thomas Mullen died testate on January 21, 1931. His wife was named as executrix in the will. She declined to act and requested the appointment of F. B. Durrie as administrator with the will annexed, and he was appointed and qualified as such administrator on February 23, 1932. The legatees and devisees named in the will, appellants here, are the surviving wife and the sons and daughters of the deceased, all of whom reside without the state of Montana.

On October 14, 1932, Durrie, as administrator, made and filed his final account of his administration of the estate. The appellants filed objections to the account, contesting the allowance of an item in the sum of $6,208.88, being a savings account in the United States National Bank at Deer Lodge, and to an item of $620 withdrawn from the same bank account and converted into a cashier's check which was forwarded to Dr. E. S. Morrow, in Los Angeles, California, for medical services rendered to the deceased during his last illness, and to a like item of $200, withdrawn from the account in the same manner and for which a cashier's check was forwarded to the widow in Los Angeles in payment of a family allowance.

The United States National Bank suspended business on October 22, 1932. Durrie, at the time of his appointment as administrator and until the bank closed, was its cashier and

in full charge of the affairs of the bank under the control of the board of directors. He was a stockholder, but not a director, in the bank. Appellants contend that Durrie was negligent in failing to withdraw the amount of the savings account in the bank. The court by a general order overruled the objections of the appellants and sustained the account of the administrator as filed. The appeal is from this order.

The funds in the savings account were on deposit in the bank in question for many years prior to the death of the deceased. Subsequent to the appointment of Durrie as administrator, the account was changed to his name as administrator of the estate of the deceased. No additional funds were credited to the account after his appointment, other than items of interest accruing thereon. The pass-book for the account, it appears, remained in the possession of the widow. She was present in Deer Lodge at the time of the appointment of the administrator. Other funds belonging to the estate were on deposit in other banks in Deer Lodge. The widow by letter requested the administrator to leave the funds in the several banks as they existed at the time of Mullen's death. This request was followed by the administrator.

The only witnesses called by the objectors were the administrator, one of the members of the board of directors, and the receiver of the bank. There is no conflict in the testimony as between the several witnesses. Under this state of the record this court is called upon, as was the trial court, to say whether the undisputed testimony justifies the findings made. (*Fleming* v. *Consolidated Motor Sales Co.*, 74 Mont. 245, 240 Pac. 376; *Weiss* v. *Hamilton*, 40 Mont. 99, 105 Pac. 74.)

This being a proceeding equitable in its nature, this court will, it being a proper case, review all questions of fact arising from the evidence presented by the record and determine the same, as well as questions of law. (*In re Connolly's Estate*, 79 Mont. 445, 257 Pac. 418.) This necessitates an examination of the evidence.

The administrator, Durrie, as the managing officer of the bank, was thoroughly familiar with the affairs and condition of the bank at all times. It appears that in the fall of 1931 various directors of the bank were indebted to it. At the suggestion of Mr. Durrie these directors secured a loan on their individual notes from a banking institution in Helena in the sum of $48,000, which sum was paid into the bank and for which notes of like amounts were indorsed to them without recourse. Many of the notes so indorsed and delivered were those of the directors, although not all. The bank was in nowise obligated as a result of this transaction and thereby liquidated its notes in the amounts stated. The bank in the spring of 1932 obtained two loans from the Reconstruction Finance Corporation aggregating the sum of $88,000, and to secure the payment of the same pledged collateral of the face value in double the amount of the loans.

The bank, by notice printed on its pass-books, reserved the right to require a ninety-day notice of withdrawals of savings accounts. Such a notice appeared on the pass-book of the savings account in question. In the latter part of July or the first of August the bank for the first time exercised this reserved right as to the withdrawal of a particular savings account, and from that time on, until the bank closed in October, it exercised the right of notice as to withdrawals of large amounts. Durrie testified: "Any one who desired to make a withdrawal of anything of a normal amount for necessary purposes, they were paid right off, * * * even up to $500." When inquired of as to the purpose of invoking the rule of notice, he stated: "I would say that the requiring of notice was a precautionary measure at the time it was first put into effect. We had funds to pay the withdrawal at the time we first started requiring notice. But we felt it was a matter of good business and we had been told by the Banking Department and other good banks that it was customary nowadays to require notices on large withdrawals." He further testified: "The withdrawals came with no particular I will say rush, but there was a steady withdrawal,

and when it was learned that we were requiring notice, other people who had not thought of withdrawing thought possibly then it was necessary and they started filing their notices as a means of being able to get their funds in case they wanted them. It proved to be a bad move to take to require a notice because we got some very unfavorable advertising on account of it, but we did not anticipate it at the time."

It appears that at the time the bank closed it had failed to secure a further loan from the Reconstruction Finance Corporation. Mr. Durrie testified as to the cause of the closing, as follows: "We closed that time because we had failed to get certain relief measures that we felt we were going to get without any question, and we felt that the interests of depositors would be jeopardized by remaining open, and that we would be preferring creditors to pay some depositors and not able to pay others." He further testified that in the forepart of October he informed the board of directors that, if they failed to get certain assistance which they had every reason to expect, the bank might be put in a dangerous position, and that he only had actual knowledge that the bank would close on the day preceding its failing to open for business.

John McInerney, who was the vice-president of the bank and somewhat active in its affairs, testified that the bank did become short of cash on account of the depression, and because they could not collect their loans in the latter part of September or early in October.

J. H. Morrow, the receiver, testified that the liabilities of the bank amounted to $550,000; that the face value of the assets, excluding the stockholders' liability, was $780,000, and that the stockholders' liability was $100,000 additional, of which he estimated $30,000 would be ultimately collected; and he gave as an approximation that the bank would ultimately pay its creditors 50 cents on the dollar.

The bank did not close as the result of the failure of any other banking institution in which the bank in question had funds on deposit.

No attempt was made on the trial of this case to show what the condition of the bank was at any time, between the appointment of the administrator and its closing, other than the testimony already noted disclosed.

In the case of *In re Connolly's Estate*, 79 Mont. 445, 257 Pac. 418, 423, this court said: "The executor is chargeable with the whole of the estate of the decedent which may come into his possession, at the value of the appraisement contained in the inventory (sec. 10282, Rev. Codes 1921) ; and while he is prohibited from making profit from its increase, yet he is not required to 'suffer loss by the decrease or destruction, without his fault, of any part of the estate' (Id. 10283). The universal rule seems to be that—'Executors and administrators are not insurers, nor will they be chargeable with the loss or depreciation of the assets where they have acted in good faith and with due prudence and diligence in the care and management of the estate, but they are liable for losses which are the consequence of bad faith or the want of due prudence and diligence.' (24 C. J., p. 123.) An executor fulfills his trust obligation to the estate when he deposits estate funds temporarily with a responsible bank; and, where he acts in good faith in the exercise of his best judgment, he is not liable for loss occasioned by the failure of such bank. (*Pethybridge* v. *First State Bank of Livingston*, 75 Mont. 173, 243 Pac. 569; *State* v. *Kearns*, 79 Mont. 299, 257 Pac. 1002; Woerner on Administration, 2d ed., p. 710; 11 Cal. Jur., p. 1023)."

Therefore, in order for the administrator to be chargeable with the loss of the funds in the closed bank, it must appear from the evidence that he was negligent in not removing the funds belonging to the estate. Negligence, as applied to acts of omission, is the failure to do what a reasonable and prudent person would ordinarily have done in the circumstances of the situation. (*Zanos* v. *Great Northern Ry. Co.*, 60 Mont. 17, 198 Pac. 138.)

The question is fairly presented: Would a reasonably prudent person, having knowledge of such facts as this record discloses was in the possession of the administrator Durrie, have

withdrawn the estate funds or given notice in ample time so that they might have been withdrawn before the closing of the bank?

The appellants insist that the foregoing question should be answered in the affirmative, and that by reason of Durrie's negligence the funds deposited in the bank were lost to the estate, and that he is therefore chargeable with their loss. They rely upon a number of decisions from other courts where a result in accord with their contentions was sustained on appeal. An examination of these decisions, and particularly of the facts before the court in these various cases, renders them distinguishable from the facts here present, as we will demonstrate. In the case of *In re Enfield's Estate*, (Iowa) 251 N. W. 637, the cashier of the bank was likewise the administrator of the estate. Prior to his appointment a voluntary assessment of approximately one hundred per cent. on the stockholders had been paid. The deceased was a depositor in the bank in question. The administrator withdrew funds from another bank and deposited them in his bank. Following his appointment there was a gradual shrinking in the bills payable and individual deposits in the bank. There were but few days during the entire period following his appointment on which the balance of cash available in the bank was sufficient to pay the amount of the estate's deposit. An examination of the condition of the bank by the banking authorities some four or five months before its closing disclosed that nearly fifty per cent. of the bank's bills payable were classified as objectionable. The foregoing facts were disclosed by the evidence, and, although the administrator testified that he believed the bank to be solvent and at no time believed the funds in his hands were in danger of being lost, the trial court found otherwise, basing its opinion upon the evidence before it as to the condition of the bank from time to time during the period of the deposit. This conclusion was affirmed on appeal.

The Oklahoma case of *In re Horseman's Estate*, (Okl. Sup.) 29 Pac. (2d) 589, was one where the administrator was also the cashier of a bank. Following his appointment he with-

drew the funds of the estate from another bank and deposited them in his own, with funds already there belonging to the estate. Within thirty days after his appointment he participated with other directors of the bank in a meeting in which the voluntary liquidation of the bank was decided upon, and as a result of which meeting the bank was placed in the hands of the state banking department for liquidation. There was no attempt made in that case to show that the administrator was free from negligence. The trial court found against the administrator, and the case was affirmed on appeal.

The case of *In re Scudder's Estate*, 21 Misc. 179, 47 N. Y. Supp. 101, 105, involved an administrator who was the managing officer of a bank in which, following his appointment, he deposited funds belonging to the estate, withdrawn from another banking institution. The court in its opinion observes that there was considerable evidence given as to the financial condition of the bank, but adds that "it is not necessary to discuss said evidence at length."

In the Oklahoma case the bank failed so soon after the deposit of the funds of the estate that it could scarcely be contended that one in charge of the bank would not appreciate and know the danger of its failing. Furthermore, the administrator, as the Oklahoma court pointed out, made no affirmative showing whatsoever as to his freedom from negligence. In the New York and Iowa cases, supra, evidence was received as to the exact condition of the bank, from which the court was able to conclude that anyone of reasonable prudence would have known that the bank was in imminent danger of closing.

As noted above, no evidence was offered on the trial of this cause as to the condition of the bank at any time, other than the testimony of the receiver, given some four months following its closing. His testimony was as to its condition on the date of the trial.

The only facts produced in the record tending to alarm a reasonably prudent person as to the condition of the bank are the following: (a) The bank had borrowed $88,000; (b) withdrawals were exceeding deposits; (c) the officers of the bank

decided to require notice of the withdrawal of savings accounts in excess of $500 in accordance with known rules of the banking institution, although sufficient cash was available at that time to take care of the immediate needs of the bank, including the proposed withdrawal of funds. As against these facts we have the positive testimony of the cashier and the managing director to the effect that they had no reason to believe that the bank was in danger of closing until within a few days prior to the occurrence of that event.

If it be said that the circumstances enumerated supra tend to support a charge of negligence, when considered as against the positive testimony of the administrator which, if believed, absolved him from all negligence, created a conflict in the evidence, how fare the appellants? The trial court found that the administrator was free from negligence. This court will not reverse a judgment unless the evidence strongly preponderates against the decision of the trial court, and where there is a conflict in the evidence, and it furnishes reasonable ground for differing conclusions, the judgment will not be disturbed on appeal. (*Kirby* v. *Hoeh*, 94 Mont. 218, 21 Pac. (2d) 732; *Baker* v. *Citizens' State Bank*, 81 Mont. 543, 264 Pac. 675.)

In the absence of evidence as to the condition of the bank following the appointment of the administrator, which would lead a reasonably prudent person to a different conclusion from that testified to by the officers of the bank, the evidence does not warrant a different conclusion from that of the trial court as to the savings account.

As to the two cashier's checks, the evidence discloses that they were not paid by the bank. It also appears that the obligations for which they were tendered have been paid from other funds of the estate. The administrator is entitled to credit for the payment of these obligations. The funds deducted from the savings account for the issuing of these cashier's checks have never been withdrawn from the bank. It appears in the record that no claim for this portion of the savings account has either been presented to the receiver or

by him allowed. If the administrator has failed to present claims in the sum of $820 to the receiver, or failed to present them within the proper time, the estate has lost through his neglect so to do the sum of $820, with which sum he should be charged. The record, although it is clear that the debts owing by the estate have been paid for which the cashier's checks were tendered, is not clear as to whether the administrator, when he made these payments, secured the checks. It is silent as to when the time for filing claims against the bank will expire, or when it did expire, if such is the fact.

It is accordingly ordered that the cause be remanded, with directions that further testimony be received as to the two cashier's checks; and if it then appears that the administrator failed to file claim for the cashier's checks and secure the allowance of such claim, that he be charged with the sum of $820; and, if it appears that proper claim has been filed and allowed, then the original order will stand affirmed. If the order appealed from stands affirmed, respondent will recover his costs. If the order is modified in accordance with this opinion, the appellants will recover their costs.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MATTHEWS and STEWART concur.

MR. JUSTICE ANGSTMAN, dissenting in part: I agree in the main with the principles of law announced in the foregoing opinion, but do not agree with the conclusions drawn from the facts.

It is my opinion that the evidence discloses that the administrator, who was also cashier, stockholder and managing officer of the bank, was in effect using the estate funds as oakum for calking the seams of the sinking ship in a futile effort to save the cargo. I think it must be held that he knew or, as a reasonably prudent person, should have known, that the bank was an unsafe receptacle for trust funds long before the bank closed. He testified:

"Q. Those withdrawals became heavier as the months went along, beginning, say, with the year 1932, until your withdrawals became pretty heavy along about the 1st of July, and during July and August, did they not? A. I won't say that they were any heavier than they had been, but our collections became much less along about that time, which made the thing look different to us and made it more acute. * * *

"Q. Mr. Durrie, the bank was forced to make every endeavor to gather in all the resources possible to meet the demands made on it from day to day, beginning sometime in the spring of 1932, and from then on, was it not? A. I would say that that would be true with all banks.

"Q. It was particularly true with this one, was it not? A. Possibly so."

The bank in the spring and summer of 1932 borrowed $88,000 from the Reconstruction Finance Corporation by putting up collateral in twice that amount. The directors had been borrowing money for the bank on their individual unsecured notes. The withdrawal situation became acute in the first part of August, 1932, to the extent that Durrie himself invoked the rule against allowing withdrawals of savings accounts without notice. In the forepart of October, Durrie informed the board of directors that, if there was failure to get certain assistance which was expected, the bank would be in a dangerous position. He never advised the legatees and devisees of the condition of the bank.

Durrie also testified: "Q. To what, then, would you attribute the closing? A. I would attribute the closing to our inability to get additional financing that we had every reason to expect, and for the further reason that we had no liquidation from the fall proceeds of sales of live stock.

"Q. It was apparent along in July, wasn't it, that you were not going to have any liquidation in the fall of any of your securities to any great extent? A. Well, that is a matter of opinion.

"Q. It turned out that way, anyway, didn't it? A. It developed that way, much to our surprise.

"Q. And also because of the fact that you had some arrangements made to take care of liquidation that fell down, too? A. That is true.

"Q. For what reason did those arrangements fall through? A. You will have to ask the powers that be about that.

"Q. Anyway, they wouldn't accept the bank's paper for loans during the months of September and October, would they? A. Well, I will not say it that way. In fact, they offered to loan us additional money, but they argued with us the point that they felt it would be a temporary matter, and with the amount of withdrawals that people were starting to give to us, they felt it would be better for ourselves and the public and the depositors that we refrain from making further drawings. Of course, they felt those things, as a rule, don't improve with age. And we got our reply about two days before we suspended.

"Q. These people who were talking to you were bankers? A. Yes, they were people at the head of the Reconstruction Finance Corporation."

In speaking of the notice required on withdrawals, Durrie said: "It had been the policy of the bank and the policy of most banks in this district that we didn't require notice on small amounts, but we reserved the right, the same as other savings banks, to require notice if we saw fit, and as I recall, and I think I am correct, that no amounts of $100 or less we would require notice on, as I recall, and then it graduated to a five hundred dollar amount, and all amounts of $500 or over we reserved the right to require ninety days notice."

It should be noted that the failure to borrow from the Reconstruction Finance Corporation was the determining factor in closing the bank. This attempted loan was not one made in the regular course of business, but was characterized by Durrie himself as a *relief measure*. It was known by Durrie, that, if it went through, it would be a temporary matter only. In the face of this critical condition of the bank known to Durrie, but not to the beneficiaries of the trust who were non-

residents, he neither notified them so they could protect themselves, nor took any steps to act for them.

An administrator, in addition to acting as the personal representative of the deceased, occupies the position of trustee for the persons beneficially interested in the estate. (11 R. C. L. 6; *Vanderpool* v. *Vanderpool,* 48 Mont. 448, 138 Pac. 772.) As trustee he is bound to act in the highest good faith toward his beneficiary in all matters connected with the trust. (Sec. 7888, Rev. Codes 1921; *Glendenning* v. *Slayton,* 55 Mont. 586, 179 Pac. 817.) If he becomes charged with any duty adverse to the interest of his beneficiary in the subject of the trust, he must immediately inform the beneficiary. (Sec. 7893, Id.)

Where loss of estate funds occurs, the burden is on the administrator to show that it was without his fault. (*In re Horseman's Estate,* (Okl. Sup.) 29 Pac. (2d) 589; *In re Connolly's Estate,* 73 Mont. 35, 235 Pac. 408; Id., 79 Mont. 445, 257 Pac. 418; *In re Jennings' Estate,* 74 Mont. 449, 241 Pac. 648.)

The duty to protect the funds of the estate was superior to that of keeping the bank open and a going concern. The failure of the administrator to withdraw the funds cannot be justified on the theory that, if he had done so, it might have precipitated the closing of the bank sooner. (*In re Kendrick's Estate,* 214 Iowa, 873, 243 N. W. 168.)

Durrie himself invoked the rule requiring notice of withdrawals. Before doing so, I think, as a reasonably prudent person he should have withdrawn the trust funds; but, if not, he should certainly have suspended the rule and withdrawn them before the bank finally closed, for he knew long before it closed that it was in a critical condition, and, if he had a right to invoke the rule, he also had the right to suspend it.

Durrie's naked statement that he did not know the bank would be closed until the day before it closed will not avail him where, as here, the circumstances were such that he, as cashier and manager of the bank, should have known sooner that its condition was unsafe and that it was in grave dan-

ger. Knowledge of its critical condition, and not knowledge of the precise time when the bank would close, marks the time when he should have acted in the interest of the beneficiaries of the trust.

I think the court erred in settling the account as to the item of $6,208.88. Having reached this conclusion as to the item of $6,208.88, and this being the amount of the savings account before the deduction of the $620 and the $200 for which cashier's checks were issued, I think the trial court's conclusion on the items of $620 and $200 was correct.

Rehearing denied June 15, 1934, Mr. Justice Angstman dissenting.