I agree in the main with the principles of law announced in the foregoing opinion, but do not agree with the conclusions drawn from the facts.
It is my opinion that the evidence discloses that the administrator, who was also cashier, stockholder and managing officer of the bank, was in effect using the estate funds as oakum for calking the seams of the sinking ship in a futile effort to save the cargo. I think it must be held that he knew or, as a reasonably prudent person, should have known, that the bank was an unsafe receptacle for trust funds long before the bank closed. He testified: *Page 157 
"Q. Those withdrawals became heavier as the months went along, beginning, say, with the year 1932, until your withdrawals became pretty heavy along about the 1st of July, and during July and August, did they not? A. I won't say that they were any heavier than they had been, but our collections became much less along about that time, which made the thing look different to us and made it more acute. * * *
"Q. Mr. Durrie, the bank was forced to make every endeavor to gather in all the resources possible to meet the demands made on it from day to day, beginning sometime in the spring of 1932, and from then on, was it not? A. I would say that that would be true with all banks.
"Q. It was particularly true with this one, was it not? A. Possibly so."
The bank in the spring and summer of 1932 borrowed $88,000 from the Reconstruction Finance Corporation by putting up collateral in twice that amount. The directors had been borrowing money for the bank on their individual unsecured notes. The withdrawal situation became acute in the first part of August, 1932, to the extent that Durrie himself invoked the rule against allowing withdrawals of savings accounts without notice. In the forepart of October, Durrie informed the board of directors that, if there was failure to get certain assistance which was expected, the bank would be in a dangerous position. He never advised the legatees and devisees of the condition of the bank.
Durrie also testified: "Q. To what, then, would you attribute the closing? A. I would attribute the closing to our inability to get additional financing that we had every reason to expect, and for the further reason that we had no liquidation from the fall proceeds of sales of live stock.
"Q. It was apparent along in July, wasn't it, that you were not going to have any liquidation in the fall of any of your securities to any great extent? A. Well, that is a matter of opinion.
"Q. It turned out that way, anyway, didn't it? A. It developed that way, much to our surprise. *Page 158 
"Q. And also because of the fact that you had some arrangements made to take care of liquidation that fell down, too? A. That is true.
"Q. For what reason did those arrangements fall through? A. You will have to ask the powers that be about that.
"Q. Anyway, they wouldn't accept the bank's paper for loans during the months of September and October, would they? A. Well, I will not say it that way. In fact, they offered to loan us additional money, but they argued with us the point that they felt it would be a temporary matter, and with the amount of withdrawals that people were starting to give to us, they felt it would be better for ourselves and the public and the depositors that we refrain from making further drawings. Of course, they felt those things, as a rule, don't improve with age. And we got our reply about two days before we suspended.
"Q. These people who were talking to you were bankers? A. Yes, they were people at the head of the Reconstruction Finance Corporation."
In speaking of the notice required on withdrawals, Durrie said: "It had been the policy of the bank and the policy of most banks in this district that we didn't require notice on small amounts, but we reserved the right, the same as other savings banks, to require notice if we saw fit, and as I recall, and I think I am correct, that no amounts of $100 or less we would require notice on, as I recall, and then it graduated to a five hundred dollar amount, and all amounts of $500 or over we reserved the right to require ninety days notice."
It should be noted that the failure to borrow from the Reconstruction Finance Corporation was the determining factor in closing the bank. This attempted loan was not one made in the regular course of business, but was characterized by Durrie himself as a relief measure. It was known by Durrie, that, if it went through, it would be a temporary matter only. In the face of this critical condition of the bank known to Durrie, but not to the beneficiaries of the trust who were nonresidents, *Page 159 
he neither notified them so they could protect themselves, nor took any steps to act for them.
An administrator, in addition to acting as the personal representative of the deceased, occupies the position of trustee for the persons beneficially interested in the estate. (11 R.C.L. 6; Vanderpool v. Vanderpool, 48 Mont. 448, 138 P. 772.) As trustee he is bound to act in the highest good faith toward his beneficiary in all matters connected with the trust. (Sec. 7888, Rev. Codes 1921; Glendenning v. Slayton, 55 Mont. 586,179 P. 817.) If he becomes charged with any duty adverse to the interest of his beneficiary in the subject of the trust, he must immediately inform the beneficiary. (Sec. 7893, Id.)
Where loss of estate funds occurs, the burden is on the administrator to show that it was without his fault. (In reHorseman's Estate, (Okla. Sup.) 29 P.2d 589; In reConnolly's Estate, 73 Mont. 35, 235 P. 408; Id., 79 Mont. 445,257 P. 418; In re Jennings' Estate, 74 Mont. 449,241 P. 648.)
The duty to protect the funds of the estate was superior to that of keeping the bank open and a going concern. The failure of the administrator to withdraw the funds cannot be justified on the theory that, if he had done so, it might have precipitated the closing of the bank sooner. (In re Kendrick's Estate,214 Iowa, 873, 243 N.W. 168.)
Durrie himself invoked the rule requiring notice of withdrawals. Before doing so, I think, as a reasonably prudent person he should have withdrawn the trust funds; but, if not, he should certainly have suspended the rule and withdrawn them before the bank finally closed, for he knew long before it closed that it was in a critical condition, and, if he had a right to invoke the rule, he also had the right to suspend it.
Durrie's naked statement that he did not know the bank would be closed until the day before it closed will not avail him where, as here, the circumstances were such that he, as cashier and manager of the bank, should have known sooner that its condition was unsafe and that it was in grave danger. *Page 160 
Knowledge of its critical condition, and not knowledge of the precise time when the bank would close, marks the time when he should have acted in the interest of the beneficiaries of the trust.
I think the court erred in settling the account as to the item of $6,208.88. Having reached this conclusion as to the item of $6,208.88, and this being the amount of the savings account before the deduction of the $620 and the $200 for which cashier's checks were issued, I think the trial court's conclusion on the items of $620 and $200 was correct.
MR. JUSTICE ANGSTMAN dissenting.