270 P.2d 404 (1954)
In re MINDER'S ESTATE.
MINDER et Al.
v.
GRAY
No. 9138.
Supreme Court of Montana.
May 6, 1954.
*406 Ernest A. Peterson, Eugene F. Bunker, Bozeman, for appellant.
Michael J. O'Connell and Joseph B. Gary, Bozeman, for respondents.
ADAIR, Chief Justice.
This is an appeal by Frank M. Gray from an order refusing to grant him letters testamentary and from an order granting to the respondent William Gaffke, letters of administration with the will annexed in the estate of Alfred Minder, deceased.
Alfred Minder died December 4, 1950, at Bozeman, Montana, being survived by five sons and six daughters, all of legal age, except the youngest son, who was then 18 years old.
The decedent left estate in Gallatin County, Montana, all of which he disposed of by his last will wherein he named the appellant, Frank M. Gray, as sole executor. By the terms of his will the decedent gave to his wife Mary Minder all of his estate both real and personal except the sum of one dollar each which he gave to his sons and daughters, the name and address of each being set forth in the will.
Petition No. 1. On January 31, 1951, and without a word of complaint or warning made or given to appellant, the respondent Mary Minder filed a petition requesting that the court grant letters of administration with the will annexed to the respondent William Gaffke and that it fix his bond in a sum not to exceed $1,000, stating in such petition that her "request is made upon the grounds and for the reason that the undersigned does not wish Frank M. Gray, attorney at law, to serve as executor of the estate of the above named decedent, and for the further reason that it is the wish of the undersigned that said William Gaffke serve as administrator with the will annexed for the above named estate."
It was the testator, and not his widow, who had the absolute right to name the person who should take charge of, manage and administer his estate.
The appointment of an executor is left solely to the testator, unless he delegates this right. 21 Am. Jur., Executors and Administrators, sec. 54, p. 404, 33 C.J.S., Executors and Administrators, sec. 22, p. 903; In re Effertz' Estate, 123 Mont. 45, 207 Pac. (2d) 1151, 11 A.L.R. (2d) 1278; Hartnett v. Wandell, 60 N.Y. 346, 349, 19 Am. Rep. 194.
The testator having exercised his right to choose his executor, the latter derives his authority from the will and his power to act from his qualifications in compliance with the law and not from the wishes of testator's widow. 33 C.J.S., Executors and Administrators, sec. 22, p. 903.
In the case of McManus' Estate, 212 Pa. 267, 61 A. 892, the surviving children of the decedent all joined in signing a letter, addressed to a trust company named by decedent as one of two executors, requesting that both executors renounce their right to letters testamentary stating that, "it is desirable to the parties that both the executors named in the will shall renounce, so that letters of administration with the will annexed, may issue in accordance with the wishes and interests of the family. We therefore respectfully ask that you further the family wishes by formally renouncing the executorship." The trust company, declining to accede to the above request, petitioned for and was granted letters testamentary. In commending the executor for refusing to renounce its right to letters the appellate court said: "* * * it is proper for us to say that the appellant's refusal to renounce its right to letters testamentary on the estate of the deceased, when requested so to do by her children and residuary legatees, is to be commended. * * * It was unreasonable and inconsistent with proper respect for the memory of the testatrix *407 by her children and beneficiaries. She had not seen fit to make her children her executors, and, after naming but one of them as an executor, she joined the appellant with him, manifestly because she was unwilling that the settlement of her estate should be committed to him alone. When, upon the probate of the will, the appellant learned, if it did not know before, that it had been named as one of the executors, it properly recognized what it felt to be a duty which it owed to the deceased and which it assumed by taking out letters testamentary. Unless it had agreed with the deceased that it would act as one of her executors, and, in reliance upon its promise to do so, she had appointed it, it might for any good reason have declined to act without inviting criticism; but it certainly ought not to have done so for the reason given in the letter addressed to it requesting its renunciation. It is a trust company * * * and one of its corporate purposes, known to the public, is to act as executor; and, when named as such, a worse reason why it should refuse to act can hardly be conceived than that the children of a testator, to whom he was unwilling to commit the administration of his estate, are opposed to the executor named by him and wish to take the settlement of the estate into their own hands."
Whom the testator will trust so will the law.
Petition No. 2. Also on January 31, 1951, the respondents Mary Minder and her son-in-law, William Gaffke, without having made any complaint or given any warning to appellant, filed their joint petition for the admission to probate of Alfred Minder's will,  for the granting to the respondent William Gaffke of letters of administration with the will annexed and for a court order for the production in court of the will and all other papers that testator had placed in appellant's custody.
In their joint petition respondents aver that appellant failed to petition for probate and for letters testamentary within 30 days after he had knowledge of testator's death and that thereby he forfeited his right to such letters by reason of the provisions of R.C.M. 1947, sec. 91-804.
Answer. On February 7, 1951, the appellant filed his answer to respondents' petitions. In such answer appellant avers that upon learning of testator's death he promptly took charge of the will and notified the respondent Mary Minder and her son Harold Minder that he was about to file a petition for the probate of the will but that they requested that he withhold petitioning for probate until the health of the respondent Mary Minder improved and until said Harold Minder returned from a trip he was making outside of this state; denies that by his failure to sooner deliver the will into court or to sooner petition for probate and for the issuance to him of letters testamentary he has forfeited his right to such letters; avers that he has exercised diligence in every respect in which diligence is required in the matter; avers that he is ready, willing and consents to act as executor; that he has never renounced his right to act as executor and avers that letters testamentary should issue to appellant as the person named as executor in said will. The answer also denies all the allegations of respondents' petitions not expressly admitted, qualified or denied.
Petition No. 3. Also on February 7, 1951, the appellant Frank M. Gray filed in the district court of Gallatin County a petition for the probate of the will and for the issuance to him of letters testamentary wherein, by appropriate averments, appellant sets forth and shows the facts, matters and information required by the provisions of R.C.M. 1947, sec. 91-803.
Objections. Thereafter, on February 19, 1951, the date set for the hearing of the probate of the will, appellant filed written objections to the granting to the respondent Gaffke of letters of administration with the will annexed upon the grounds:
1. That appellant is the person named as executor in testator's will; that he is over the age of 21 years,  a resident of Gallatin County, Montana, and has filed an answer to respondents' joint petition for the appointment of an administrator with the will annexed and has filed a petition in appellant's own behalf asking for probate *408 of the will and for his appointment as executor.
2. That appellant has not renounced his right to act as executor; that he is ready and willing to act as such; that he will appear and qualify for the appointment as executor when ordered by the court so to do; that he will discharge the trust imposed, conserve the estate, not waste any of its resources, handle the affairs of the estate with dispatch and administer the estate so that distribution be made in accordance with the testator's intent and the order of court;
3. That delay on appellant's part to petition for probate does not in any sense amount to renunciation of appellant's right and that good cause has been shown for such delay as has occurred; and
4. That the testator enjoys the right to determine who shall execute his will provided that the person selected be competent and is not disqualified. Appellant prays for an order denying respondents' petitions for letters of administration c.t.a., and for an order that letters testamentary issue to appellant.
The Hearing. On February 19, 1951, being the time set therefor, a hearing was had on (1) the separate petition of the respondent Mary Minder for the appointment of her son-in-law Gaffke as administrator c.t.a., (2) respondents' joint petition for probate and letters of administration c.t.a., (3) appellant's answer to the above petitions, (4) appellant's objections to the appointment of William Gaffke as administrator c.t.a., and (5) appellant's separate petition for probate and for letters testamentary.
Will Admitted. Following the hearing the trial judge made an order admitting the will to probate. This order is unchallenged. All parties concede that the will was properly admitted.
Appeal. On March 23, 1951, the district judge made and filed written findings of fact and conclusions of law and also an order adjudging that appellant, the person named in the will as executor, had waived, renounced and forfeited all right to letters testamentary by having, without good cause, failed to petition for such letters for more than 30 days after he had knowledge of testator's death.
On April 2, 1951, the district judge made a further order granting to the respondent, William Gaffke, letters of administration c.t.a., and fixing his bond.
This appeal is from the above orders so made on March 23, 1951, and April 2, 1951, respectively.
Review on Appeal. An action to probate a will is a special statutory proceeding, equitable in nature and, in a review on appeal, is governed by the rules that apply in an equitable action.
R.C.M. 1947, sec. 93-216, prescribes the duty of the supreme court when reviewing on appeal matters and proceedings of an equitable nature such as are here presented.
Section 93-216, supra, inter alia, provides: "In equity cases, and in matters and proceedings of an equitable nature, the supreme court shall review all questions of fact arising upon the evidence presented in the record, whether the same be presented by specifications of particulars in which the evidence is alleged to be insufficient or not, and determine the same, as well as questions of law, unless, for good cause, a new trial or the taking of further evidence in the court below be ordered". Also see, In re Connolly's Estate, 79 Mont. 445, 450, 257 Pac. 418; In re Sikorski's Estate, 127 Mont. 563, 268 Pac. (2d) 395.
Mere failure to file his petition for probate and for letters for 30 days or more after learning of testator's death will not of and in itself effect a forfeiture of the named executor's right to letters testamentary, for, if and when good cause be shown for the delay, then and thereupon, the trial judge is divested of his authority to adjudge an involuntary or implied renunciation of the named executor's right to letters testamentary.
The statute from which the trial judge derives the requisite authority that enables him to act in the event the named executor without good cause shown therefor shall delay petitioning for probate and for letters testamentary, is R.C.M. 1947, sec. 91-804, which provides: "If the person named in a will as executor, for thirty days after he *409 has knowledge of the death of the testator, and that he is named as executor, fails to petition to the proper court for the probate of the will, and that letters testamentary be issued to him, he may be held to have renounced his right to letters, and the court or judge may appoint any other competent person administrator, unless good cause for delay is shown." Emphasis supplied.
Section 91-804, supra, is merely an enabling statute. Its language is permissive and directory only. It says "may be held" and "may appoint." "`The words "may alter or revoke" are clearly enabling and permissive  not destructive or restrictive.'" In re Walters' Estate, 60 Nev. 172, 104 Pac. (2d) 968, 970.
Section 91-804, supra, is neither mandatory nor jurisdictional. It does not compel action. It merely permits action and then only in a case coming squarely within its provisions. Compare Abshire v. School District, 124 Mont. 244, 245, 220 Pac. (2d) 1058; Hill v. County of Lewis & Clark, 54 Mont. 479, 483, 171 Pac. 929.
It is only where the facts and circumstances fail to show good cause for delay in filing the petition that the court is either authorized or enabled to hold that the person named as executor, by his delay in filing his petition, has impliedly and in effect renounced his right to letters testamentary.
In Fiddyment's Estate, 74 Cal. App. (2d) 72, 168 Pac. (2d) 61, 63, the appellate court affirmed the action of the trial court in granting letters testamentary to two executrices who had delayed filing their petition for some five years after testatrix' death, notwithstanding the provisions of section 324 of the California Probate Code which are identical with those of section 91-804, supra, of the Montana Code. There the California court said: "In its interpretation of this section, the Supreme Court, in Re Estate of Randall, 177 Cal. 363, 170 Pac. 835, in affirming an order of the trial court revoking the letters of administration with the will annexed previously issued to a sister of the decedent and granting, instead, letters to the widow who had been named as executrix in the will, stated that the renunciation referred to in said section is not the equivalent of a voluntary renunciation, and that the action of the trial court in appointing the named executrix as provided in the will must be sustained in the absence of a showing of an abuse of discretion. In other words, as the district court in Re Estate of Martin, 31 Cal. App. (2d) 501, 507, 508, 88 Pac. (2d) 234, 237, succinctly stated, `it should be further noted that section 324 of the Probate Code is not mandatory but is discretionary.' See, also, In re Estate of Vernon, 182 Cal. 91, 187 Pac. 11; Estate of King, 4 Coffey's Prob. Dec. 10, 20."
It is conceded that appellant did not file his petition for the probate of the will and for letters testamentary until February 7, 1951, being more than 30 days after he had knowledge of the death of the testator.
The Issue. The issue presented is simple, namely:
Was good cause shown for the delay?
The answer is to be found in the facts and circumstances shown.
Alfred Minder was a long time resident of Gallatin County, Montana, where he owned and operated a well improved farm of irrigable, tillable lands whereon he made his home and resided. His business was farming and raising, feeding, buying, selling and trading livestock.
Frank M. Gray, also a long time resident of Gallatin County, for forty years past has been a duly licensed attorney and counselor at law, actively engaged in the practice of his profession and maintaining his law office at Bozeman, Montana. For sixteen of those years Attorney Gray was a neighbor, personal friend and the legal adviser of Alfred Minder.
On December 3, 1948, Alfred Minder made his last will and testament which he left in the custody of his counsel, Frank M. Gray.
In November 1950 Alfred Minder, while on a thoroughfare in Bozeman, suffered a heart attack. There the stricken man was found by his friend Frank M. Gray who took him to the hospital where after lingering a short while he died.
Had appellant been so disposed he could have filed both the will and his petition for the probate thereof and for the issuance to *410 him of letters testamentary on the very day that he learned of the death of the testator. R.C.M. 1947, sec. 91-802. The filings could have been made without consulting with or giving any notice whatever to either the widow or any other member of testator's family. However the appellant did not choose to take any such precipitous action.
The matter of communicating with or consulting the heirs, legatees and devisees before depositing the will in court or before filing a petition for the probate and letters rests, not upon the written law, but rather with the sense of appropriateness of the custodian or of the person named in the will as executor and his regard for the dictates of common courtesy, consideration and decency.
In common practice most persons named in a will as executor abide an appropriate time to inform the legatees and devisees of the fact that the deceased left a will and of the executor's intention to petition for its probate and for letters. These things Frank M. Gray promptly did in the instant case, not because the law so provided but because it appeared to be the kind, the right and the decent thing to do.
Ordinarily the named executor seeks to enlist the cooperation and assistance of the legatees and devisees in marshalling the assets and in ascertaining the character and value of the property lebt by decedent and this is what Mr. Gray attempted to do in the instant case.
Appellant testified: That he did not then know whether or not the testator had made a more recent will than the one left in appellant's custody but that appellant "believed that he hadn't"; that some time prior to testator's demise appellant had prepared certain deeds of conveyance covering certain tracts of testator's lands but that appellant did not then know whether such deeds were either delivered or recorded during testator's lifetime or whether they were merely testamentary in character; that appellant did not then know precisely what property, real or personal, the testator had or the amount standing to his credit in the bank at the time of death and that to obtain such information and to get some comprehensive idea as to the property comprising the estate, appellant sought to interview and enlist the cooperation and assistance of the testator's widow, Mary Minder, before petitioning the court for probate and for letters testamentary.
Accordingly, immediately following testator's funeral, which was held December 7, 1950, appellant tried for a couple of days to contact Mary Minder at her farm home by telephone but without success.
Finally, about December 10 or 11, 1950, he reached the widow by telephone and informed her that her husband had left his will and certain other papers with appellant; that the deceased had named appellant as the executor of the will and that appellant would like for the widow to come to his office at her convenience and give him such information as she had concerning testator's property to which she said, "All right," but that she wasn't feeling well then but as soon as she got better she would come in. The appellant testified: "She sounded as though she was sick. I believe she was sick."
Mary Minder delayed coming to appellant's office for about 7 or 8 days after engaging in the above telephone conversation with him.
However, about 5 days after appellant had talked with the widow, her son Harold Minder, then aged 33 years, who had come to Bozeman from his home and place of business at or near Seattle, Washington, to attend his father's funeral, came to appellant's office, alone. Harold said that he came for the purpose of ascertaining what his father had done about his property. Appellant permitted him to read his father's will. Thus did Harold learn that under the terms of the will his share in his father's estate, like that of his four brothers and six sisters, is but the sum of one dollar and that all the remainder of the estate goes to his mother.
Appellant testified: "He wanted the transactions in Seattle between himself and his father kind of kept out of the picture some how or other and still he be protected and I didn't know how to do it."
Again: "Harold was up and told me not to talk about the transactions between him *411 and his father because he thought it would prostrate his mother. I told him * * * if he was going to make a claim it would have to be brought out and he said all his brothers and sisters would be on his neck. He didn't want that.
"He had all the papers in Seattle. When he got out there he would take care of the transfer of the business which he was about to do from Seattle to Spokane and he wouldn't be over four or five days. Then he would bring that stuff all in and we would go over it and he, at the same time, told me he had paid all the bills in the estate, I didn't have anything to do and that I ought to cut that fee down to $1,500, he had seen a lawyer about it and they wasn't going to stand for that kind of stuff."
Again: "Well, when Harold came in the first time he wanted to know what had to be done. I told him that the will had to be probated and there were certain costs and the court would fix the fees as to attorney or executor or both and he wanted to know where he would get his money and I told him. Well, he said, we don't want to sell the place as long as mother lives. `We can fix it so she can stay there, can't we? I haven't got a mortgage but mother is going to give me a mortgage on it.' I said, she can't do that right away because this thing has to go through process of probate first. He said, `I have a $16,000 note of my dad's money I furnished him here. I just paid off $6,000 worth of bills,' and I said, `Well, those things will have to come out, have to file proper claims for them, make your proof on it.' He said, `To hell with that noise.' He didn't seem to want to have the thing done but he kept insisting that his mother was in such a condition of health that he surely didn't want it done right away, we could figure out some way so it wouldn't have to go through that."
On December 18, 1950, the respondent Mary Minder made her one and only visit to appellant's office. Her son Harold came with her. She was handed the will which she read. Appellant then explained to her the statutes governing the probate of wills and told her that he needed certain deeds, abstracts, promissory notes, a statement showing testator's bank account at the date of his death and whatever she had.
Appellant testified: "When they first came up, Mrs. Minder said she was surprised that anything like that had to be done. She thought when a man made a will they didn't have to probate it. I explained to her the situation. She wanted to know what it was going to cost. I told her I didn't know, that depended on the appraised value of the estate and the amount of work necessary to clear it up and she wanted to know if I could give her an estimate, so then I told them what the minimum fee was on stipulated amounts but I couldn't tell them, it was something I didn't know. I told them the court would probably set that in an order the last thing and the payment would be made then. * * * Q. Now, I gleaned from your testimony, Mr. Gray, that you did call to Mrs. Minder and to Harold's attention the necessity of taking steps to probate this will, is that correct? A. That's right. Q. Did Harold or Mrs. Minder ever call you? A. They never did."
Some time after leaving appellant's office the widow and Harold went to the bank, unaccompanied by appellant, and took from testator's safety deposit box all the papers therein contained.
About December 19, 1950, being the day following the widow's visit to appellant's office, Harold Minder returned there, alone, bringing with him "abstracts, notes, different things dad had" in his safety deposit box but he did not bring the requested bank statement nor did he supply appellant with any information that would disclose the amount or condition of testator's bank account.
Harold testified that on this, his third trip to appellant's office: "I told him that mother wasn't feeling too good some days, and good other days, if there was some papers we had to sign and she didn't feel like walking up those steps * * * and he could come up to the ranch, but to get things wound up as soon as possible and get it off our hands. In fact, I wanted it done in six months."
*412 At this time there were no papers that any of the heirs, legatees or devisees "had to sign." Appellant had the will in his possession. All that was required of appellant, as custodian of the will, was to leave it in the office of the clerk of the district court. The delivery to the district court required no signing of any paper.
To petition for the probate of the will and for the issuance to him of letters testamentary appellant need only prepare and file, in the office of the clerk of the district court, his petition setting forth the information and statements required by R.C.M. 1947, sec. 91-803, which petition only appellant "had to sign." Thus there were no papers that any heir, legatee or devisee "had to sign" to institute the probate proceedings.
It stands undisputed that testator's estate exceeds in value the sum of $10,000 and, under the law in force at the time of testator's death and at the time the probate proceedings herein were commenced, the creditors of the estate were allowed ten months after the first publication of the statutory notice to creditors within which to present their claims, R.C.M. 1947, sec. 91-2702, so that it was not possible, under the then existing law, to have the administration "wound up * * * in six months" within which time Harold testified he "wanted it done." See In re Higgins' Estate, 15 Mont. 474, 487, 488, 39 Pac. 506, 28 L.R.A. 116; Roche Valley Land Co. v. Barth, 67 Mont. 353, 356, 215 Pac. 654.
When asked as to whether he had made any other trips to appellant's office after December 19, 1950, and before returning to his home, Harold Minder testified: "No, I left for the coast, I think that day or the next." Thus it appears that on either December 19 or 20, 1950, Harold left Bozeman for his home in the State of Washington. He did not return to Bozeman until about January 29 or 30, 1951.
In connection with the meeting of December 19, 1950, the appellant testified:
"Q. In your answer to the petition of the petitioners you say that you requested, you were requested by Harold Minder to hold off until he came back from Seattle, is that correct? A. Yes. * * * Anyway, it was just the day before the very day he left because he came up to my office and told me he was leaving right then. He said he would be back in five days, just as soon as he could get some papers back there he was going to move to Spokane.
"Q. That was on or about the 19th of December? A. Yes.
"Q. What did he say to you at that time? A. He said, `Just leave it go, when we get all these papers together, then we will go over and see what is best to be done.' He said, `I don't want my mother to go to the hospital over this thing.'"
Harold Minder was not "back in five days" nor was he back in five weeks.
A few days after the meeting of December 19th, appellant was called to Ellensburg, Washington, by the death and burial there of a member of his family from which mission appellant did not return to Bozeman until December 29, 1950, on which date he telephoned Mary Minder and again reminded her that he would like to have the bank statement and other information which he had requested but again Mary Minder failed to furnish either the bank statement or the other data required to enable appellant to marshal the assets of the estate and learn something of the character and value of the property comprising the estate so that he could intelligently set forth in a petition for probate of the will, the matters and statements required by R.C.M. 1947, sec. 91-803, and particularly subdivision 4 thereof.
About January 10, 1951, appellant again telephoned Mary Minder for the bank statement.
Appellant testified: "I know I called her. I said, `The time is long past, you should have gotten it. I would like to have it and also the other property listed.' * * * I know I got impatient. I called her up and told her I received my bank statement several days previously and I wanted that bank statement as something to show what Mr. Minder's bank account was on the 4th day of December at the time of his death."
*413 When asked if she ever complied with appellant's request to furnish him the bank statement, Mary Minder testified: "Oh, I would say he called me up, and I would say that was about the 10th of January and I told him that I would send it in and I had Joe bring it to him * * * He called me up and asked me for that. I told him as soon as I had a chance I would. Q. This was about the 10th of January? A. I think it was. I'm not sure."
On January 10, 1951, when the above telephone conversation was had, the widow had already permitted 37 days to pass after her husband's death without supplying the named executor with the testator's bank statement or a list of the other personal property in the estate. Even at such late date, the respondent widow's reply to appellant's request that she furnish him with the bank statement was: "I told him as soon as I had a chance I would."
The above testimony not only falls far short of showing expeditious co-operation on the part of the respondent widow but it affirmatively shows and establishes good cause for appellant's failure to petition for the probate of the will and for letters testamentary within 30 days after receipt by him of knowledge of the death of the testator.
About a week after his above telephone conversation of January 10, 1951, with testator's widow, appellant was called to Redding, California, in connection with the death there of one David Breneman, whose sister, a Mrs. Crail of Anaconda, Montana, sent appellant to represent her interests in California. The handling of this matter kept appellant from his Bozeman office for some eight or ten days.
On cross examination by respondents' counsel, appellant testified: "Q. Mr. Gray, in your answer, you have alleged that Mrs. Minder requested the holding off of the filing until after her health improved. A. That's right, just before I left for California I talked with her but it was very brief and she said she was still not feeling well enough to take care of it and that Harold had not come back from Seattle and she wouldn't do anything until he did, that all the books and papers and stuff between he and his father were out there."
Although Mary Minder was in attendance before the trial court at the time her own counsel developed the above testimony, she did not thereafter take the stand to either controvert or explain such testimony.
After attending to the Breneman matter, appellant returned to his office at Bozeman about the 27th or 28th of January 1951, at which time he promptly telephoned Mrs. Minder. He testified that by this time he had decided he would wait no longer on anyone but that he would draft a new petition for probate of the will and then go ahead on his own to ascertain exactly what property belonged in and to the testator's estate. At this turn of events Mary Minder got busy on the long distance telephone and called her son Harold at his home in the State of Washington, whereupon Harold returned to Bozeman at once, arriving about January 29 or 30, 1951.
Change of Lawyers. Upon his return to Bozeman, Harold Minder immediately set about "to change lawyers,"  to oppose and prevent the administration of the estate by Attorney Gray, the named executor,  "to try and get it out of his hands,"  to have his brother-in-law, William Gaffke, appointed administrator with the will annexed,  to take all papers and matters pertaining to the estate out of appellant's hands and law office and to place them in the hands and law office of the then county attorney, all without any notice to or knowledge of appellant.
To that end, and without communicating with Attorney Gray and without giving him any notice whatever that any person interested had expressed any dissatisfaction with his handling of the estate, the county attorney, acting as counsel for Harold, his mother and his brother-in-law, William Gaffke, set about preparing various petitions, orders and notices for filing in the district court as preliminary to preventing the issuance of letters testamentary to appellant and to having testator's will admitted to probate and letters of administration with the will annexed issued to the respondent Gaffke.
On January 31, 1951, after all the aforesaid papers, that were to initiate these proceedings, had been prepared or were in *414 the course of preparation, for signature and filing, Harold Minder made his fourth trip to appellant's office, being his first appearance there since December 19, 1950.
On this visit of January 31, 1951, Harold talked with appellant without divulging to him that already arrangements had been made and the papers drafted "to get it out of his hands" and "to change lawyers" or that appellant was about to be cited into court to there defend his right to carry out the testator's directions and intentions as expressed in his last will naming appellant as executor and entrusting to him the administration of the estate.
On being interrogated as to whether in his interview with appellant on January 31st he said anything about intending or arranging "to change lawyers" Harold testified:
"Q. Did you say anything to Frank Gray about your intentions of filing this petition for letters of administration with the will annexed prior to your filing it? Did you notify Frank Gray that you were going to do it? A. That I was going to change lawyers.
"Q. Was going to be done? A. That I was going to change lawyers?
"Q. Was going to be done? A. No, I didn't. I went to Frank first, though.
"Q. But so far as you were concerned you left the impression with Frank, did you not, that he was to have the will and to probate it? A. I did."
The law is not so unjust as to reward those who by deceit, misrepresentation and chicanery have misled another into action or non-action.
In 31 C.J.S., Estoppel, sec. 59, p. 239, it is said: "When a party unjustly contrives to put another in a dilemma and to subject him to necessity and distress and he acts one way, it is not for the wrongdoer to insist that he should have acted another way." Also see R.C.M. 1947, sec. 93-1301-6, subd. 3; Lindblom v. Employers' Liability Assur. Corp., 88 Mont. 488, 493, 496, 295 Pac. 1007, 1008.
Under the circumstances here shown respondents may not reap the technical advantages provided by sec. 91-804 to appellant's injury and detriment.
Appellant testified: "Q. Did the petitioners, or anybody in their behalf, tell you about this petition was going to be filed prior to its being filed? A. They never did."
The Canons of Professional Ethics adopted by the American Bar Association, in part, provide:
"7. * * * Efforts, direct or indirect, in any way to encroach upon the employment of another lawyer, are unworthy of those who should be brethren at the Bar; but, nevertheless, it is the right of any lawyer, without fear or favor, to give proper advice to those seeking relief against unfaithful or neglectful counsel, generally after communication with the lawyer of whom the complaint is made.
"8. * * * A lawyer should endeavor to obtain full knowledge of his client's cause before advising thereon, and he is bound to give a candid opinion of the merits and probable result of pending or contemplated litigation. * * * Whenever the controversy will admit of fair adjustment, the client should be advised to avoid or to end the litigation.
"9. * * * A lawyer should not in any way communicate upon the subject of controversy with a party represented by counsel; much less should he undertake to negotiate or compromise the matter with him, but should deal only with his counsel. * * *
"16. * * * A lawyer should use his best efforts to restrain and to prevent his clients from doing those things which the lawyer himself ought not to do, particularly with reference to their conduct towards Courts, judicial officers * * * and suitors * * *
"25. * * * A lawyer should not ignore known customs or practice of the Bar or of a particular Court, even when the law permits, without giving timely notice to the opposing counsel. * * *" Emphasis supplied.
On January 31, 1951, respondents' counsel filed in the district court the separate *415 petition of Mary Minder and the joint petition of Mary Minder and William Gaffke, thereby initiating the proceedings now before us on this appeal.
Upon the filing of such petitions the district judge on January 31, 1951, made two ex parte orders wherein a day certain was fixed for the hearing,  the giving of notice of such hearing was ordered and appellant was cited to appear in court and to produce the will and other papers that had been delivered into his possession by the testator.
Subsequent to the filing of respondents' petitions and the issuance of the above orders thereon, to-wit, on February 1 or 2, 1951, Harold Minder made his fifth and final visit to appellant's office at which time he demanded that appellant hand over to him all the papers pertaining to testator's estate to which demand appellant declined to accede. Harold testified: "Q. Did you go up to Gray's office after the petitioner in this action here filed her petition with this Court? A. I went up after we filed the petition and told Gray what I was doing and asked him to get the papers and forget it. He said he wasn't going to forget it and we talked."
Of course, Harold was wholly without right or authority to demand that Attorney Gray surrender to him the will and other papers that the testator had left in Mr. Gray's custody and the attorney quite properly declined to hand over the papers to Harold whose share in the estate was and is but the sum of one dollar.
Thereafter the sheriff, on February 2, 1951, served upon appellant the judge's order of January 31, 1951, commanding that appellant bring to court testator's will and other papers.
R.C.M. 1947, sec. 91-803, in part, provides: "A petition for the probate of a will must show: * * * The probable value and character of the property of the estate".
Respondents' joint petition overlooks the personal property left by the decedent. It states that the deceased "left estate * * * consisting of real property" and that "No personal property belonging to the deceased has been discovered."
Throughout this entire proceeding extreme reluctance has been manifest on the part of respondents and Harold Minder to disclose to the named executor, the court and others concerned the kind, character and amount of personal property in the estate.
At the hearing held on February 19, 1951, Harold Minder, Mary Minder and William Gaffke were sworn as witnesses and each gave testimony in support of respondents' joint petition.
Throughout his examination of both Harold Minder and Mary Minder, respondents' counsel studiously avoided interrogating either as to the probable value or the character of the property comprising testator's estate, R.C.M. 1947, sec. 91-803, subd. 4, and neither Harold nor his mother gave any testimony respecting such matters.
The Witness Gaffke. To establish the probable value and character of the property respondents relied solely upon the testimony of the witness, William Gaffke, who, on his direct examination, in part, testified:
"Q. Was he [testator] the owner of both real and personal property situate in the County of Gallatin at the time of his death? A. Yes.
"Q. What real estate do you know of that Mr. Minder owned at the time he died? A. Consisted of 80 acres along the Huffine Lane, as far as I know.
"Q. Do you know of any other property he had at the time of his death? A. Well, he had a car, I believe, and some personal property, probably.
"Q. Would you say the value of Alfred Minder's property at the time of his death was in excess of ten thousand dollars? A. Yes."
On his cross examination by appellant's counsel the reticent witness said as little and failed to remember as much as was possible. Here is the complete record of his cross examination by appellant's counsel:
"Cross Examination by Mr. Peterson:
"Q. You know that Frank M. Gray was named in the will as the executor of the will, do you not, Mr. Gaffke? A. I do.
*416 "Q. Before you filed this petition in court for your appointment as administrator with the will annexed, did you have any talk with Frank Gray about the matter? A. I did not.
"Q. Did someone ask you to sign this petition? A. Yes.
"Q. Who? A. Well, two or three, I believe.
"Q. Who, for instance? A. Well, Mrs. Minder and her son, Harold.
"Q. Mary L. Minder? A. Yes, sir.
"Q. Who else? A. Harold.
"Q. Harold Minder? A. Harold Minder.
"Q. Who else? A. Harold Minder.
"Q. Yes, who else? A. I think that's all.
"Q. And when did they ask you to? A. I don't remember.
"Q. Do you recall the day you signed the petition? A. I don't remember.
"Q. How many days before you signed the petition were you requested to sign the petition, if you know? A. I don't remember.
"Mr. Peterson: That's all. (Witness excused.)"
On respondents' case in chief and before appellant gave any testimony whatever the respondent Mary Minder and her son Harold Minder testified that neither had requested appellant to hold up the filing of either the will or of the petition for probate.
After the respondents and their witnesses had given their testimony and respondents had rested their case, then the appellant Frank Gray was afforded his first and only opportunity to take the witness chair and testify as to the facts, circumstances and conditions that caused and resulted in such delay as had occurred in petitioning for probate of the will and for the issuance to him of letters testamentary.
The appellant gave his testimony both on direct and cross examination while both Mary Minder and her son Harold Minder were in attendance upon the court, yet neither they nor any other witness thereafter took the witness stand to controvert or explain any part of appellant's testimony.
Appellant testified that on December 29, 1950, he returned to Bozeman from Ellensburg, Washington, on which date he again telephoned respondent Mary Minder. He testified:
"I immediately called Mrs. Minder again and told her that I would like to have those things. She said she hadn't been at all well. She was under doctor's care and that her son Harold hadn't come back yet.
"Q. Did she say he hadn't come back from any particular place? A. From Seattle.
"Q. What else did she say, if anything? A. That was all. I told her I hoped she got to feeling well and could comply with the requests that I had already made. I had received the abstract but I didn't have any idea what they claimed to be the estate and particularly with regard to the bank account and she said they would have the bank account after the first. I told her she could go in and get a statement of it at that time. I knew they would be glad to give it to her.
"Q. Mr. Gray, do you have a general idea of what Mr. Minder's estate was? Do you know something about his business? A. Well, I had done business for him for a long time, about sixteen years and I know he was feeding a good many cattle out to his place, things like that. He was a trader in that stuff. * * *
"Q. Were you pursuing a plan to collect his property before filing the petition, is that the idea? A. That's right. That is what I wanted to do, is get some comprehensive idea of what he had left in the way of property.
"Q. What property did you know about? A. I knew about the 80 acres less, I think one acre that I had made a deed for and then a five-acre tract that I made a deed and there was a note and that deed. I don't remember whether we recorded it or not but I couldn't find out about where those were.
*417 "Q. Did you make any inquiry from Mrs. Minder about the personal property such as livestock, farming machinery, household goods and things of that sort? A. I did.
"Q. Did she furnish you a list of those? A. She did not.
"Q. Did you request them? A. I did. * * *
"Q. Regarding this bank account, Mr. Gray, couldn't you have obtained that information by way of telephone from the bank? A. I never go to a bank and make inquiry of that thing until after an appointment has been made because they don't give it to you."
On cross examination by respondents' counsel, appellant testified: "Q. Are you familiar with the laws of Montana regarding the filing of the petition and will within thirty days after  A. Certainly. I even read it to those people and asked them to co-operate with me. Q. Mr. Gray, in your answer, you have alleged that Mrs. Minder requested the holding off of the filing until after her health improved. A. That's right, just before I left for California I talked to her but it was very brief and she said she was still not feeling well enough to take care of it and that Harold had not come back from Seattle and she wouldn't do anything until he did, that all the books and papers and stuff between he and his father were out there."
Relative to his interview with Harold of January 31, 1951, appellant testified: "Harold was up at my office the 31st and he was especially nervous.
"He asked me what I was doing. I told him I had decided to draw a new petition in his father's estate and I wasn't going to wait any longer. I had just talked to his mother four days before. He hadn't gotten back as he agreed he would and that I was going ahead and I would find out what was in the estate. He didn't need to worry. He said, `for God's sake, don't do that, it would kill mother.'"
Appellant was also interrogated and made answer as follows:
"Q. Did he [Harold] request you to hold off filing the petition until he came back? A. That's right. There wasn't any question. In the meantime, I had called Mrs. Minder at least half a dozen times.
"Q. Do you feel that any delay that has been occasioned here has been your fault, Mr. Gray? A. None whatever. I was ready and able to file it. I did want to know something about what I was doing about it but when Harold said he had to attend to other incidentals and so forth that didn't make any difference to me. I wanted him to go, if he thinks he needed further  he said, no, not to file it, his mother was in very critical condition."
Appellant was the only witness who gave testimony in support of his answer and objections to respondents' petitions and in support of his own petition for probate and for letters testamentary.
After testifying on direct examination appellant was cross examined at length by respondents' counsel at the conclusion whereof appellant rested his case. Thereupon the trial judge, in open court, inquired of respondents' counsel, "Do you have any rebuttal on behalf of petitioners?" to which respondents' counsel answered: "Your Honor, we have no rebuttal * * * That's all we have." The trial judge then asked: "You fully rest?" and respondents' counsel replied: "Yes, your Honor."
No one other than the respondent Mary Minder and her son Harold were in a position to controvert, explain or modify the testimony given by appellant detailing what these two said and did in their contacts and conversations with appellant, and although both the respondent widow and her son were in attendance upon the court when appellant gave his testimony, neither they nor any other witness gave any testimony whatever after appellant left the witness stand.
The rule that the trial judge may not disregard uncontroverted credible evidence is fundamental. Higby v. Hooper, 124 Mont. 331, 352, 221 Pac. (2d) 1043; State *418 ex rel. Nagle v. Naughton, 103 Mont. 306, 310, 63 Pac. (2d) 123; Haddox v. Northern Pac. R. Co., 43 Mont. 8, 113 Pac. 1119.
In the case of In re Leland's Will, 219 N.Y. 387, 114 N.E. 854, 856, it is stated that, "the testator still enjoys the right to determine who is most suitable among those legally qualified to settle his affairs and execute his will, and his solemn selection is not lightly to be disregarded. Appointment is not to be refused merely because the testator's selection does not seem suitable to the judge. * * * The courts will not undertake to make a better will nor name a better executor for the testator. They will not add disqualifications to those specified by the statute, nor disregard testator's wishes by too liberal an interpretation of the specific disqualifications * * *." Also see In re Bauquier, 88 Cal. 302, 26 Pac. 178, rehearing denied in 88 Cal. 302, 26 Pac. 532; McGregor v. McGregor, 1 Keyes, N.Y., 133, 3 Abb. App. Dec. 92.
Here there is neither pleading nor proof that anyone has been injured or that any damages in any sum or amount have been sustained by anyone by reason of the failure to sooner petition for probate and for letters testamentary.
In the case of In re Fiddyment's Estate, supra, the court said [74 Cal. App. (2d) 72, 168 Pac. (2d) 63]:
"In any event, appellant fails to show that the conduct of respondents, whether or not it resulted from ignorance of the facts, was in any way prejudicial to appellant. * * *
"Again, in the case of Estate of King [4 Coffey's Prob. Dec. 10], supra, the court observed (p. 20):
"`In what has been said section 1301 [former Code Civ. Proc., now sec. 324, Probate Code] is not overlooked, wherein it is provided that a failure for thirty days to petition for letters may be held to amount to a renunciation unless good cause for delay is shown; but the cause for the delay here sufficiently appears, and even if no such cause appeared, there would be no occasion for the court to exercise the discretion given by this section against the executors, for the delay has resulted in no injury to the persons interested under the will, or to the heirs of the testator.'"
Alfred Minder had the right to make the will that he made. He had the right to cut off his sons and daughters with but one dollar each. He had the right to give to his widow the remainder of his property. He had the right to name his friend, neighbor and legal adviser Frank M. Gray, as sole executor. Appellant is qualified and willing to accept the trust and to perform the duties thereto attendant. It was Alfred Minder's last will that appellant take charge of and administer the estate.
The testator's intent as to the person who shall be granted letters testamentary as such intent is disclosed by his will is controlling unless violative of law. R.C.M. 1947, secs. 91-201, 91-209, 91-315, 91-1301 and 91-1302; In re Effertz Estate, 123 Mont. 45, 207 Pac. (2d) 1151, 11 A.L.R. (2d) 1278; In re Kelly's Will, 134 Misc. 399, 235 N.Y.S. 683.
Alfred Minder's will is valid. It must be given effect.
"The court itself can make no original appointment of an executor, since its power is limited to recognizing and approving or disapproving an appointment made by the testator. So far as possible, the courts carry out the intention of the testator by seeing that the trust is committed to the one designated by the testator." 21 Am. Jur., Executors and Administrators, sec. 54, p. 404; In re Effertz' Estate, supra.
The fact that an executor derives his authority primarily from the will serves to distinguish him from an administrator who is appointed by a court of probate from a person or class designated by statute and who derives his source of power solely by his appointment by the court. 33 C.J.S., Executors and Administrators, sec. 22, p. 904; 21 Am. Jur., Executors and Administrators, sec. 54, p. 404.
"The statutory right to administer an estate is a valuable right and one that may be enforced." In re Wilcox' Estate, 122 Mont. 290, 201 Pac. (2d) 989, 990.
After a careful examination of all the testimony and authorities cited we are of the opinion that the evidence strongly *419 preponderates against the district judge's findings, conclusions and orders of which complaint is here made, and that it was and is an abuse of discretion to make such findings, conclusions and orders. See Grant v. Michaels, 94 Mont. 452, 459, 460, 466, 23 Pac. (2d) 266, 269, 270, 272.
It was error for the trial court to make the particular findings, conclusions and orders complained of and same are set aside and vacated. The appellant was and is entitled to letters testamentary and to take charge of and administer testator's estate.
Accordingly the order granting letters of administration with the will annexed to the respondent William Gaffke and the order refusing to grant letters testamentary to the appellant Frank M. Gray are hereby set aside, vacated and reversed and the cause is remanded to the district court with directions to forthwith and on the showing heretofore made at the hearing held February 19, 1951, grant and issue to the appellant Frank M. Gray letters testamentary herein and that he be allowed the full commissions and compensation allowed by statute upon the entire estate and property accounted for in the matter of testator's estate from December 4, 1950, to the time appellant's trust is fully performed,  distribution made and the administration closed. It is so ordered. Remittitur to issue forthwith.
MR. JUSTICES BOTTOMLY and FREEBOURN, concur.
MR. JUSTICE ANGSTMAN:
I concur in the result but not with all that is said in the foregoing opinion.
MR. JUSTICE ANDERSON: (dissenting).
I do not propose to burden the reader with a mass of material in an attempt to offset that contained in the majority opinion. Suffice to say that the reasons given by the named executor of the Minder will, for the delay in filing a petition for letters, are ones which were controverted by testimony offered by those opposing his views.
Granting that the evidence in contravention of that given by Attorney Gray, the named executor, is not as lengthy as his, none the less it is present and is sufficient to give rise to the doubt which is contemplated for resolve by the statute. R.C.M. 1947, sec. 91-804.
This court has repeatedly held that where the evidence is conflicting the decision of the trial court, if supported by substantial evidence, will be affirmed.
Hon. W.W. Lessley, district judge presiding, had full opportunity to view the witnesses and to observe their demeanor and judge their veracity. It could well be that had I been sitting as the trial judge I may have reached a different conclusion than that reached by Judge Lessley. However I was not so situated and I do not wish to substitute myself in the position of a court of first impression or to substitute my judgment for that rendered by the judge thereof.
I cannot agree that the ethics of the lawyers representing the Minder heirs is open to attack for the reason that the named executor, a lawyer, is no more immune to an attack by a lawyer than would be an executor that might be a farmer or laborer. In fact if the latter were being attacked under the same circumstances, this court should be more inclined to offer its helping hand because the farmer or the laborer would be less likely to be familiar with the technical procedure of probate law. No one sought a change of lawyers. It was an executor, not a lawyer, who was being challenged.
The judgment and order of the district court should be affirmed.